Plaintiff was forcibly ejected from the saloon owned and operated by the partnership, Monsour's No. 4, at the corner of Milam and Edwards Streets in the City of Shreveport, Louisiana, and brought this suit to recover damages for physical injuries sustained by him while being ejected, plus hospital and medical expenses incurred in alleviating his physical condition. The partnership, its individual members, G.J. and Fred Monsour, its insurer, The Indemnity Insurance Company of North America, and Vince Principe, the employee who effected the ejection are impleaded as defendants against whom judgment in solido is sought.
Plaintiff alleged that while in said saloon, as a patron, without cause or reason, said Principe accosted and insulted him by accusing him of being a loafer and a moocher; that said employee ordered petitioner to leave the place and upon his declining to do so, he seized petitioner while he was sitting in a chair, rushed him backward to the entrance door and threw him with great force onto the sidewalk. He further alleged that when the above related facts occurred there were several persons within the saloon who heard and saw what happened; that petitioner was greatly humiliated and embarrassed thereby. He also alleged that when released by Principe at the entrance door, after being rapidly pushed several feet by him, petitioner fell to the sidewalk and therefrom sustained intertrochanteric comminuted transverse fracture of the femur, upward and lateral displacement of the shaft, from which injury he was confined in a hospital from September 22, 1945, until December 6, 1945; that from said injury he suffered severe and excruciating pain and permanent disability. *Page 136 
It is expressly averred that the duties of said Principe, among others, included that of keeping out of said saloon and ejecting after gaining entrance thereto, loafers, moochers and other undesirable persons; that in pursuance of said duties he ejected, without cause, your petitioner in the manner hereinabove described.
Defendants, while admitting the ownership and operation of the saloon by the partnership, and employment by it of Principe, articulately deny all other allegations of the petition. No special defense is set up.
The Shreveport Charity Hospital intervened in the case and, after alleging that plaintiff was treated by it for said injuries, prays that in the event of recovery of judgment by him against defendants that there also be judgment in its favor for the sum of $313.50, being the amount of charges for medical and other services rendered plaintiff, plus ten per cent thereof as attorney's fee; to be paid from the judgment in plaintiff's favor. Act 289 of 1938; Act 94 of 1934; Act 126 of 1924.
There was judgment for plaintiff against all defendants for $2,500. There was judgment also in favor of the intervener and against all defendants for the amounts claimed in the intervention. All defendants, except Principe, appealed suspensively. In answer to the appeal, plaintiff asks for substantial increase in the award to him.
This case was tried before Judge John R. Pleasant, who resigned as Judge before it was argued and submitted. The case was thereafter argued before Judge E.P. Mills, who rendered judgment therein. Because of this unusual feature of the case, appellants argue that the rule, generally prevailing, that except for manifest error in resolving factual questions the trial court's action thereon should not be disturbed, does not find application herein.
Plaintiff gave the following version of the facts attending and immediately preceding his ejectment from the saloon, to-wit:
He was sitting at a table with some friends drinking beer and as he finished drinking he recognized an old friend at the bar who owed him one dollar; that he walked over to this friend and said to him: "Having a drink?" whereupon the battender (Principe) admonished him not to mooch customers or he would put him out. He admits that this threat to eject him made him very angry as he considered it an insult. He testified that following this incident, he walked to a chair by one of the tables and sat down; that at the same time Principe came from behind the counter, grabbed him violently by the arm, lifted him from the chair and backed him rapidly, some fifteen feet toward and out of the front door, and as he was released he was shoved violently backward; that he lost balance and fell heavily upon the paved sidewalk; that the impact of his body against the sidewalk caused the fracture hereinabove described. Plaintiff denies that he cursed Principe or in any other manner gave him offense.
Principe testified that when plaintiff came into the saloon he walked directly to the rear thereof and conversed with two men who were drinking at a table; that a customer was at the time drinking at the bar and plaintiff approached him and said; "Aren't you going to buy me a drink?"; that he then and there told plaintiff that mooching was not allowed, and asked him to leave, whereupon, he says, plaintiff turned around and began cursing him, adding that: "If I wanted him to leave I was going to have to put him out and he dared me to gut him out"; that plaintiff sat down at a table near by and continued to curse although requested by Principe three times to leave. It was at this juncture that he came from behind the counter, pulled plaintiff from the chair and ejected him in the manner above related. He added that plaintiff was very drunk at the time.
Several men present when plaintiff was ejected testified for one side or the other. There are some material differences in their versions of the facts of the altercation resulting in plaintiff being put out of the saloon. Some say plaintiff was drunk, while others say he was drinking, but not drunk. Some testified that Principe gave plaintiff a violent shove as he released him at the door, while the testimony of others was to the contrary. According to Principe's testimony, the affair occurred immediately *Page 137 
after plaintiff entered the saloon, which, if true, precludes the possibility of him having drunk the three bottles of beer he admits he drank there, and for which he paid. There is also conflict between plaintiff and Principe as to what plaintiff said to the man at the bar that prompted Principe to ask him to leave the saloon. The man in charge of the saloon testified that when Principe accused plaintiff of begging a drink from the patron, plaintiff cursed Principe viciously, saying among other epithets that he was a "G_____D_____ liar."
It appears fairly certain that plaintiff in no uncertain manner resented the charge against him that he was begging a drink from the customer. His action in this respect, to some extent, corroborates his version of what he said to the man. It is unlikely that his temper would have been so much aroused if the charge had been true. It is entirely possible that Principe misunderstood what plaintiff said to the patron. It is certain that Principe's version of some of the facts in connection with this matter is wholly untrue. For instance, he said that beer was not then being sold there, whereas a half dozen witnesses testified to the contrary.
It is certain that immediately after the exchange of words between plaintiff and Principe the former then quietly resumed his seat at the table where he had been drinking. This act, and other movements of plaintiff immediately prior thereto, fairly well disprove the charge that he was drunk. If he had been in this condition it would have been obvious to all of the several persons present, about half of whom, without observable interest, are sure he was not drunk.
When the incident out of which this case arose happened, plaintiff was sixty-nine years old and weighed about one hundred fifty pounds, whereas Principe was, as compared, a giant, being twenty-one years of age and weighed two hundred ten pounds.
[1] It is our opinion that good cause for plaintiff's ejection did not exist; but, even if it be conceded that his conduct warranted his removal, surely the manner and method of ridding the place of his presence was entirely improper. A policeman was near by, whose duty it was, when called upon, to eject from the saloon and all others on his beat, those persons who had for any cause rendered themselves obnoxious and undesirable. This policeman was not called upon to do that which Principe arrogated to himself the right to do.
We are also convinced that as Principe released plaintiff at the door, he shoved him backward with such additional force as he believed was necessary to insure him falling upon the sidewalk, a distance of three or four feet from the door entrance. The entrance from the door to the sidewalk is slightly down grade and surfaced with glazed tile. It is not surprising that in view of these physical conditions plaintiff was unable to maintain his equilibrium.
[2] It was not specially pleaded by either defendant in answer, but on trial testimony was adduced by them to support the contention that when Principe took matters into his own hands and ejected plaintiff, he acted beyond the scope of his authority; in fact, in direct disobedience of orders given to him by his employer that always a policeman should be called to eject undesirable and obstreperous patrons who would not leave the place on simple request or entreaty. This defense, even if sustained by the testimony, is inadequate to absolve the employer of liability herein. Principe's testimony, in a large measure, negatives the contention. He testified:
"Q. The reason you were putting him out was because he was not supposed to be mooching in the place? A. I would not allow moochers and he was very tight at the time and I don't serve people who are intoxicated.
"Q. And, of course, you are supposed to put those kind of people out of your place? Eh? A. That is right.
"Q. That is right? A. That is right.
"Q. So you were not doing anything except what you were supposed to do? You did not try to hurt him? A. No, I didn't try to hurt him.
"Q. Didn't intend to hurt him? A. Didn't intend to hurt him. Just wanted to get him out of the place because he was unruly. *Page 138 
"Q. And because he didn't belong in the place? A. No, sir, he didn't belong in the place.
"Q. And you were carrying out what you were supposed to do? A. (No answer)
"Q. Is that right? A. That is right.
"Q. You pulled him out of his seat? A. Yes."
After all, Principe's action in ejecting plaintiff was designed to promote the interest and welfare of his employer by maintaining order in the place to the end that patrons would not go elsewhere to satisfy their thirst for intoxicating liquors. His action did not bring down upon him his employer's disfavor as he was not dismissed.
If the defense just referred to, in a case like this or of similar character, should be held adequate in law to absolve the employer from liability, it is easy to foresee that employers generally in this and similar lines of business could and would protect themselves against any and all acts of their employees in policing the places wherein their duties are performed, regardless of the character of the acts employed in doing so.
Defendants cite and rely upon the following cases in their effort to convince us that Principe acted beyond the scope of his authority and for this reason the employer and its insurer are not responsible in damages for his unlawful acts, to-wit: Ware v. Barataria Lafourche Canal Company, 15 La. 169, 35 Am.Dec. 189; McDermott v. American Brewing Company,105 La. 124, 29 So. 498, 52 L.R.A. 684, 83 Am.St. Rep. 225; Godchaux v. Texas Pacific Railway Company, 144 La. 1041, 81 So. 706; Valley v. Clay, 151 La. 710, 92 So. 308; Hale v. Gilliland Oil Company, 151 La. 500, 91 So. 853; Chaney v. Frigidaire Corporation, 5 Cir., 31 F.2d 977; Comfort v. Monteleone et al., La. App., 163 So. 670.
We have carefully read all of these cases and feel certain that none of them, because of difference in facts, is controlling of the issues in the present case. No good purpose would be promoted by detail differentiation.
[3] Many cases with facts similar to those of the present case have been adjudged by the Supreme Court and the Courts of Appeal of this state. It has generally been held by Courts of Appeal that where the plaintiff is proven to be the aggressor, even by the use of obscene words and highly offensive epithets applied to the defendant, no recovery can he had. However, cases of this character last decided by the Supreme Court, so far as our investigation reveals, do not go that far. For instance, in Harvey v. Harvey, 124 La. 595, 50 So. 592, it was definitely held:
"Mere abusive words, however insulting and irritating, will not justify an assault and battery; but, in a civil action for damages, such provocation may be considered in mitigation of damages."
To same effect are: Bonneval v. American Coffee Company et al., 127 La. 57, 53 So. 426; Richardson v. Zuntz, 26 La. Ann. 313.
In McVay v. Ellis, 148 La. 247, 86 So. 783, it was contended by defendant that before he assaulted and beat the plaintiff, plaintiff called him "a d__________liar." Rejecting this defense, the court said:
"The objectionable epithet was not sufficient cause or provocation for the assault and battery administered by defendant upon plaintiff, admitting that plaintiff used the epithet."
However, in the present case we think that the question of who was the aggressor has virtually passed therefrom. Conceding that plaintiff did call defendant a "G_____ d_____liar," and uttered other abusive epithets, doing so sprang from a spontaneous impulse engendered by defendant's charge that he was a moocher, begging drinks; and when plaintiff left the immediate scene of the exchange of compliments and sat down several feet distant, he certainly evinced a disposition on his part to withdraw from the unpleasantness.
[4] In plain words, the upper end of the femur of plaintiff's right leg was fractured. Such an injury is commonly referred to as a broken hip. The injury occurred September 22, 1945, and plaintiff was forced to remain in bed in the Shreveport Charity Hospital until December 6th thereafter. Naturally, he suffered much pain and discomfort during this time. For the entire period the leg was in different kinds of *Page 139 
traction and at time of trial, nine months after the injury, the fracture had made satisfactory progress toward healing. Physicians estimated that it would require three or four more months for the fracture to attain maximum of recovery. After plaintiff was discharged from the hospital he remained in bed for an additional six weeks. It is estimated by physicians that he will permanently suffer from ten per cent to twenty per cent disability of the hip. He has used crutches continuously since leaving bed. Dr. Oxford was certain that some pain in the joint would be felt for the balance of plaintiff's life, and possibly some limping would result. In addition to said injury and its direct effects, plaintiff suffered shock and considerable physical and mental disturbance therefrom.
The judgments appealed from are warranted under the established facts, and applicable law, and, therefore, they are affirmed with costs.